This is International Eyecare Center v. Hayden, 410-0966. For the appellant, Mr. Dorman, for the appellee, Mr. Sendak, you may proceed. May it please the Court, we're back again today, Your Honors, in this case involving a dispute between an employer and an employee. We're back today because my client, the employee, is presently being enjoined under a preliminary injunction entered by the trial court. And the terms of that preliminary injunction prohibit him from practicing optometry in Quincy. We believe the restrictive covenant at issue is unenforceable. And the only way that it can be applied against Dr. Hayden is to imply terms in the agreement which do not exist and to liberally construe the terms that do exist. And for that reason, we're asking that this Court remand this case back to the trial judge with a finding that this restrictive covenant is unenforceable. The term sheet at issue, and I know the Court is already familiar with this, having reviewed this in connection with the last appeal, but we're now, we're talking about a restrictive covenant term that is not even a complete sentence. And it's contained in the appendix that we submitted in A163 and quoted in the briefs. But the sentence fragment that I'm referring to reads, covenant not to compete within 20 miles of the Quincy IEC office or any IEC office where the doctor has practiced in excess of 13 weeks per year for three years from the end of employment with IEC. That sentence does not contain any specification of the activities which are prohibited under the terms of this agreement. Now, in response to the same argument that we presented to trial court, IEC asked the Court to refer back to the opening paragraph of the 2009 term sheet to leave the contract as a whole, as they argued. Now, first of all, there is no provision in the non-compete term which directs back to that first paragraph for guidance on the scope of the non-compete term. Further, the opening paragraph of the agreement applies to Dr. Hayden's job duties as they existed while he was an employee of IEC. It says nothing at all about what his duties are in the post-employment period. So again, that is the basis for our contention that in order to get where we are in this case with a blanket prohibition on Dr. Hayden's right to practice optometry, we have to imply a term that refers back to that first paragraph and we have to liberally construe this document to get to that point. That analysis is entirely contrary to Illinois law. What we have is, in this case, a non-compete term that fits the definition of contract ambiguity, and that is that we have a term that is obscure in meaning because of indefiniteness of expression, a term that is susceptible to multiple means. The scope of the activities are entirely undefined, and we've submitted some examples of just how this particular term does not give us any guidance. I mean, does it apply to working as an independent contractor optometrist at Walmart? It doesn't say. Does it apply to selling eyeglass frames? Nothing is expressed. Does it apply to performing eye exams? It doesn't say. Does it bar him from filling prescriptions related to the treatment of eye disease? No guidance on that issue. Does it prohibit consulting with other optometrists in Quincy on issues of patient care? Nothing. Does it prevent him from owning an interest in a business which offers optometric services? Again, nothing. These are all things that an optometrist would do, and there is no indication in the contract to give anyone any basis to decide, as the Court did here, because we don't have any guidance, we're just going to prohibition on Dr. Hayden's right to practice optometry. That kind of a ruling is totally at odds with the Illinois cases, and what we've cited in the briefs, and we don't have to look very far to establish that proposition, because we just look at the cases that have been cited by IEC. And they've been recited repeatedly throughout these proceedings, specifically the restrictive covenant clearly said, the doctor shall not practice medicine. Canfield v. Spear, the doctor shall not re-engage in the practice of medicine. Bower v. Sawyer, the doctor will not engage in the practice of medicine, surgery, or radiology. Prairie Eye Center v. Butler, the doctor shall not engage in any medical practice or ophthalmology practice. Gilepsy v. Carbondale Eye Centers, there was an express prohibition on the practice of ophthalmology. Vascular Surgical Associates v. Loiterman, the doctor shall not engage in the practice of vascular surgery or offer any related service. As the Court pointed out, in the case that we cited, Joliet Medical v. Ensinger, it's probably okay to have a blanket prohibition on a doctor, or in this case an optometrist's right to practice optometry. But unless that is stated in the agreement, the courts cannot read into the agreement what the parties did not express. That's exactly what the Joliet Medical Group case said. That's exactly the rule that should be applied here. One of the frustrating things about this has been the parties had a prior agreement, the 1999 agreement, which we've also got in the appendix and referenced in the briefs, where there was a specific blanket prohibition on Dr. Hayden's right to practice optometry. They took that out. It did not survive and become incorporated into the 2009 term sheet. And so what we're faced with here is an attempt by IEC to reach back to the prior provision. They clearly knew how to get the job done if that's what they wanted to do. They chose not to. And now we're stuck with the trial court trying to make some sense of this, and instead of applying the rules, goes the other way to say, and he acknowledges that this is not the best draftsmanship in the world. But he says, you know, I think it means what the first paragraph says. That's a reasonable approach to trying to solve the problem, but it violates the principles that apply in the case. The other problem is there are two activity restrictions in that restrictive covenant. One is it says that Dr. Hayden will not solicit IEC patients and he will not interview or hire current IEC employees. Those are really the only two restrictions that apply with any specificity. Those two meet the definition of contract ambiguity because they are indefinite in expression and susceptible to multiple means. And we've again stated in the briefs reasons why we think that is the case. What does soliciting mean? Does it mean telephone calls? Does it mean mass mailing? Does it mean advertising in the newspaper? Does it mean putting up a Facebook page? Advertising on Google? There's no indication. I think if you look back at the 1999 agreement, there's a clear prohibition on specific items that would fall within the category of solicitation. And there are others that say, you know, this is okay, like a Yellow Pages ad, something like that. The whole idea of who's a patient of IEC? Does that apply to current patients? Does it apply to former patients? When does a patient begin and end? Does the patient have to be There's no indication where this comes out. And again, it's ambiguous as a matter of law. The same thing with the hiring of current employees of IEC. Current as of when? When the date the term sheet was signed? The date that Dr. Hayden left? It is a clear mess. And the mess in this case, the burden of that, falls on IEC. Now, this question of, okay, you have ambiguity in a contract, as I believe we've clearly established. The question becomes, what is the court to do with that? IEC has argued, well, it's a question of fact. And the judge actually accepted that. He said, well, I don't think it's ambiguous as a matter of law, but even if it is, I think there's a question of fact here to be There's a question about the intent of the parties. And that's a question of fact at trial. But not in a case that involves a restrictive covenant. Because there are specific rules that apply. And the ordinary ones would be, you know, contract ambiguity construed against the drafter, strong presumption against terms that could have been easily included, but were not. But more importantly, over the top of all that, we have rules where the courts are required to strictly construe restrictive covenants to protect an employee's fundamental right of employment. And for that reason, the employer only gets one chance to get it right. That's the way the cases come out. If it's ambiguous, the burden is not on the employee to spend years litigating what the employer intended in the restrictive covenant. It only makes sense. And let's face it, the having a restrictive covenant, it would be that easy for the employer to simply specify, no practice of optometry. That's not what IEC did in this instance. We are now bearing the burden of that problem. And it should not be our problem. It should be IEC's problem. That's the way the law resolves this issue. For these reasons, we believe the motion to dissolve the preliminary injunction should have been granted. We ask this court to reverse the trial court and remand this with instructions that the motion for The issue that counsel raises today was addressed in the very, very first hearing before the lower court. That was in October of 2009 when we first sought a TRO. The court then reminded counsel that contracts must be construed as a whole. You take them in their entirety. You don't look at one line. You don't look at one paragraph. But you look at the entire agreement. And looking at the entire agreement, the court had no problem in finding that indeed the contract restricted Dr. Hayden from practicing optometry within 20 miles of the Quincy office and for three years, prohibited him from soliciting IEC employees and IEC patients. What was the genesis of the 2009 agreement? Why was that brought forth for negotiation or signature at that time? In 2009? Well, there was a 2001 contract that had a certain pay, a certain amount of salary in it and the bonus structure. And then in 2009, IEC sought to redo the provisions regarding compensation in dealing with how much Dr. Hayden would be paid. He was paid more and they wanted to restructure the bonus to be on a net, office net basis rather than on a gross basis based on the number of patient dollars attributed to him. It changed the formula. Not necessarily less and not necessarily more. It was a different formula. And when we were here before the court a year ago, the question then was whether or not the lower court was correct when it threw out the 2009 contract based on the pre-existing duty rule. This court then ruled that it was not, that that was in fact did not bar the 2009 contract. That was what led to the 2009 contract, which is in effect. But before the court made its pre-existing duty ruling on a motion by Dr. Hayden, the court had already made a determination that this contract was clear on its face within the four corners. Well, I guess my question is, you want to redo the compensation structure for the doctor for whatever reason. You've got a fairly extensive employment agreement from 2001, which contained a pretty explicit no loopholes involved non-compete agreement. Why was it necessary to try to restate that in the 2009 agreement as opposed to just referencing that non-compete from the 2001 agreement is still in full force in effect? The chronology is a little different, Your Honor, than I think your question implied. The 2001 contract was in form, and particularly with respect to the non-complete, substantially the same as the 2009. There was a pre-existing contract in 1999 that was the first contract Dr. Hayden signed. It was a long agreement. And sometime between that agreement and when Dr. Hayden signed the 2001 agreement, IEC went to a more abbreviated two-page form, simplicity, ease of understanding. It wasn't a document of ten pages full of legal jargon. Well, it had changed over time. Because it really wasn't the same non-compete. It changed. The 1999 contract was for a greater territorial scope, 25 miles back then. I think the years were different. I think it was two versus three. And then in 2001, they changed that to the three-year, 20-mile configuration, I think it was. There was a 2006 amendment, which changed it again. So by the time you're in 2009 and redoing the contract, it becomes a different, the non-compete is different. So if you were going to go back to 1999, you'd have to refer back to 1999 and then have a language that says, but not this, but that, not this and that. So it's a new agreement. Again, the 1999 was a long form, a lot of legal ease. It says basically three things in the non-compete. It says you can't compete by practicing optometry. Two, can't sell hardware in competition. Three, can't have a management interest in an optometry shop within the location. So you're suggesting that something changed other than distance and duration? I'm saying that distance and duration changed. Several times? Several times. What else? There was not an explicit prohibition about having an ownership interest or a management interest in an optometry location. You mean that was dropped intentionally? No, I'm not. I'm saying that there is no record of it being dropped intentionally. That was never the case. It was... Then how was it changed? The change in that it was left out inadvertently? No, no. It wasn't addressed in the 2001 contract. It was not addressed specifically as to whether or not Dr. Hayden, for example, could have an ownership interest in an optometry shop within the 20-mile limit. That was not specifically addressed. That's not the issue before this Court. Right. Because we're not arguing that he should be disallowed an ownership interest. That's not here. The only thing here is whether or not it prohibits him from practicing optometry. That's the Court's order. And this Court found a year ago, May of 2010, after we were here in 2009, that this was an enforceable agreement. We had made out a prima facie case on all elements. That was the Court's ruling then. Somewhere between the first hearing we had on the TRO when the ambiguity argument was first raised by Hayden, that argument was abandoned because it wasn't brought up before this Court on the last appeal. In fact, during the argument a year ago, counsel for Dr. Hayden said emphatically that if this Court were to enforce that covenant, it would prevent Dr. Hayden from practicing optometry in Quincy, which is what he was doing at the time. Now, the lower court has three times, four times, if you count the summary judgment ruling, ruled that the agreement on the four corners is clear, that it prohibits Dr. Hayden from practicing optometry within the 20-mile zone. And by looking at it in context, particularly in the first paragraph, it outlines Dr. Hayden's duties. It outlines what he is to do. He's to follow professional standards. He's to be employed full-time. He's to treat IEC patients. That's what he does. So consequently, and this is interesting, some point during the, not during the summary judgment hearing, but actually during the hearing for a preliminary injunction, Dr. Hayden tried to introduce parole evidence. And he did it under the argument that he should be allowed to introduce evidence provisionally, the provisional admission test. Okay, so what is the parole evidence that he offered then and is before the Court now? The only parole evidence that was offered suggests, without qualification, that Dr. Hayden is prohibited from practicing optometry in the 20-mile zone. That was the intent of the parties, because this is what, this is what happened. He introduced the 1999 agreement, long, 10 years old, just introduced it. There's no testimony from Dr. Hayden regarding that agreement. To answer the Court's question, there's no intention to say, well, we changed this, we changed that, we decided not to eliminate that. No, nothing at all. Dr. Hayden was on the stand for hours, was never once asked by counsel for Dr. Hayden what the intent of the parties was relative to the 2009 contract, or even the 2001 contract. Wasn't once asked that question. He did ask that question to the principal of IEC, John McDougall, Dr. John McDougall, and he says, what was it intended to restrict? And Dr. McDougall answered, practicing optometry within 20 miles from Quincy. He said, that's what IEC does, and that's what Dr. Hayden does. That's the only evidence, and that's the record that counsel used, Dr. Hayden used, when he brought forth his summary judgment motion before the lower court. That's the record that exists, and so there was no record from which the Court could find that the intention of the parties was anything other than to prohibit the practice of optometry within the 20 mile zone. Could Dr. Hayden have an ownership interest in a optometric practice in Quincy if he was not physically present and didn't provide any services? And he does indeed today. He could do that. We addressed that with the Court, and we said we are not taking a position that he cannot. So I guess the short answer is yes. Yes, it's not a prohibited, it's not prohibited, and we have not sought to prohibit that. And a lot of those what if questions, well, could he do this, could he do that, would he lend money? That was one thing that appeared in their brief, could he lend money? Those sorts of things were brought up before the lower court, and the lower court correctly decided it's not going to issue advisory opinions on things that are not at issue in this case. The only thing at issue is whether or not he, Dr. Hayden, can practice optometry in Quincy or anyplace else within 20 miles. That's the issue. And as I say, we believe that the language is clear on the face of it when read in context. What else could it be? In fact, the non-compete provision, a separate paragraph, says he's not to compete within 20 miles of the Quincy office or any IEC office where the doctor has practiced in excess of 13 weeks. Practice. Practice what? Practice optometry, of course. The lower court, remember, in the first hearing said, we know what it means. It's not talking about whether or not he can run marathons, I don't know where that example came up, but obviously it means he can't practice optometry within that restricted zone. We also have before the court an argument that relates to the jurisdiction of this court to hear this appeal. And the argument is that under 307A, we recognize that an appeal may be brought within 30 days from the denial of a motion to modify. But when you examine what happened in the lower court, it really was not a motion to modify. If they were going to bring an appeal, it should have been brought within 30 days of the denial, excuse me, within 30 days of the grant of the preliminary injunction. That was not done. Instead, a couple months passed and they filed a motion for summary judgment on the ambiguity theory, which was the same argument that they made during the preliminary injunction hearing. Almost the same cases, same argument, nothing really changed at all. So they made that same argument, they called it a motion for summary judgment, but they titled it a motion for summary judgment or to dissolve the preliminary injunction. And to our way of looking at it, that really is not an appropriate way to appeal the denial of a motion to modify or vacate a preliminary injunction. Why doesn't Rule 307A1 give us jurisdiction? It does ordinarily when the parties below have filed a motion to vacate. I understand that. But when the motion itself, the essence of the motion was a motion for summary judgment, case dispositive, if granted, that would have ended the case in favor of the defendant and there would not have been any vacation of the preliminary injunction. It would have ceased to exist. It really wasn't appropriate to call it or ask for a motion to dissolve the preliminary injunction because it would have dissolved on its own account. That's the stalker hinge case that we cite to the court. In that case, it was a question of whether or not the prevailing party could ask for attorney fees after the court denied a preliminary injunction, a TRO had been issued. And the court said, well, ordinarily you could get attorney fees where a TRO had been wrongfully granted. This really was not a dissolution of the TRO because once the preliminary injunction was denied, the TRO ceased to exist. It's not correct to call it a dissolution of that order or a vacation of that order, whatever terminology the court used in that case. And that's the point there. In the Rochester case, which is cited by the appellants, that's just the case that says that an appeal may be brought under 307 within 30 days following the motion denying a motion to vacate or dissolve. So it is different. It really should never have been at all entitled a motion to dissolve or vacate because it wasn't that. It was a motion for summary judgment, which in itself, if granted, would have ended the case. Thank you. Thank you. Rebuttal? Thank you, Your Honor. Just briefly on this jurisdictional issue, we've addressed this in our reply brief, but I really think there is absolutely no basis to challenge the court's jurisdiction. The case is Doe v. Illinois Department of Professional Regulation. It says, quote, the court may dissolve a preliminary injunction absent a change in facts or law from the time of issuance to the time of dissolution provided a sufficient basis exists to support dissolution. There is no language in Rule 307A prohibiting a post-preliminary injunction motion to vacate. Close quote. There's no question about the court's jurisdiction in this case. There's no question of waiver. We haven't waived this argument. Despite what I may have argued in the oral arguments of the last appeal, I have not given away some argument that the contract is unenforceable because it's ambiguous as a matter of law. That was not an issue in the first appeal. We won before we even reached that issue. I think this whole idea about the 1999 agreement and the evolution to the 2009 term sheet really points up the problem here. And what I think gives the court an opportunity to really step in and nip this in the bud, so to speak. And that is what counsel argued was that, well, the 2009 term sheet represented an attempt by IEC to simplify matters and ease the understanding of its terms. There couldn't be anything more divorced from the 2009 term sheet than taking out all of the specific language that was in the 1999 term sheet. The idea that we can somehow check a box, a covenant not to compete, we'll just check a box and we will argue later about what that really means. All that does is encourage employers to draft intentionally vague agreements so that they can get the same effect by a nice clean agreement, like the 1999 agreement, by tying up the employee in years and years of litigation, arguing about what that means. This case presents an opportunity for the court to address that issue. There are cases that talk about geographic restrictions, time restrictions. The cases are few and far between addressing the issue of activities. What does means mean? Nothing? Is that your argument? The first sentence? No, it doesn't mean nothing. It is an attempt by IEC to impose some broad, vague activities restriction that just doesn't get the job done. It's unenforceable. If it is ambiguous and there's the provisional admission concept, then why wouldn't the trial court and this court consider 1999, 2005, 2001, 2005, and 2009 to determine the parties intent and what they'd agree to? Well, it would because it puts the 2009 term sheet in perspective to be able to say, hey, IEC knew how to get the job done if that's what the parties intended. I understand that part of the argument, but you knew how to do this, why didn't you do it the same way? But I don't think that ends the inquiry. Don't you then get to say, considering this as a whole, the relationship between the parties, the negotiations between the parties, the profession that the parties practice, how they entered into this agreement originally, how they modified it over the years, how it appeared to change, this is what we think it means. This is what a court thinks it means. I don't think the court goes to that next step in a restrictive covenant case like this for the reasons I offered before. Well, then you're arguing that you should never have provisional admission in a restrictive covenant case because that would be inappropriate because it always has to be strictly construed and totally four corners because it disadvantages the party who wants to practice their profession. And yet, you're the one that sought provisional admission for all evidence. I did, for the other reason that I stated, to show that I see you've got to get the job done. But the point of not going to the next step and saying we need to get into fact issues about what the party's intended, that's not the result or the application of the law in the Bishop case or the Joliet Medical Group case or the Marwaha case. The inquiry ends when the court determines that the employer has not gotten the job done in drafting a clear restrictive covenant specifying what activities are permitted and what activities are prohibited. Any other questions? Thank you, Counsel. Thank you. We take the matter under advisory.